**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PHILIP QUARTARARO, derivatively on behalf of ZYNERBA PHARMACEUTICALS, INC. | |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| ARMANDO ANIDO, JAMES E. FICKENSCHER, JOHN P. BUTLER, WARREN D. COOPER, WILLIAM J. FEDERICI, THOMAS L. HARRISON, DANIEL L. KISNER, KENNETH I. MOCH, and PAMELA STEPHENSON, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| ZYNERBA PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Philip Quartararo ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of nominal defendant Zynerba Pharmaceuticals, Inc. ("Zynerba" or the "Company"), brings this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) as officers and/or directors of Zynerba for breaches of fiduciary duty, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations based upon investigation by counsel, including, but not limited to, a review and analysis of: (i) regulatory filings made by Zynerba with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases issued and

disseminated by Zynerba; (iii) a purported securities class action lawsuit filed in the United Stated District Court for the Eastern District of Pennsylvania captioned *Whiteley, et al., v. Zynerba Pharmaceuticals, Inc., et al.*, Case No. 1:19-cv-4959 (E.D.P.A.) (the "Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly-available information, including media and analyst reports, concerning Zynerba.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of Zynerba's officers and members of the Company's Board of Directors (the "Board") and their affiliates.  Plaintiff seeks to remedy Defendants' violations of state and federal laws from March 11, 2019 through September 17, 2019 (the "Relevant Period") that have caused and continue to cause substantial monetary damages to Zynerba and other damages, including damages to its reputation and goodwill.

2.      Zynerba is a pharmaceutical company that seeks to develop and produce transdermal cannabinoid ("CBD") therapies for rare and near-rare neuropsychiatric disorders. Zynerba does not have FDA approved drug products on the market.  Zynerba's sole and primary product in its pipeline is a transdermal CBD gel, named Zygel, to treat progressive neuropsychiatric disorders, including Fragile X Syndrome ("FXS"), developmental and epileptic encephalopathies ("DEE"), 22q Deletion Syndrome ("22q"), and Autism Spectrum Disorder ("ASD").

3.      Zygel entered a Phase II clinical trial in April 2018 called the BELIEVE 1 Trial, a six-month open label multi-dose clinical trial designed to evaluate the efficacy and safety of Zygel in children and adolescents with DEE as classified by the International League Against Epilepsy.

4.      During the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that almost all patients enrolled in the BELIEVE I Trial suffered treatment emergent adverse events,[1] a majority also suffered treatment related adverse events, and more than one fifth suffered serious adverse events, thus triggering a heightened risk to continued development of Zygel and the Company's prospects for obtaining regulatory approval to market Zygel for the treatment of DEE in children and adolescents.

5.      On September 18, 2019, the Individual Defendants began revealing the truth regarding the BELIEVE 1 trial.  In a press release issued that day, Zynerba revealed that, among patients enrolled in the BELIEVE 1 Trial and treated with Zygel, the rate of treatment emergent adverse events was 96% and the rate of treatment related adverse events was 60%.  The Company further reported that ten out of forty-six trial patients reported serious adverse events.  Eight patients discontinued the study altogether.  As a result of the revelations, the Company's stock price fell 21.77%, or $2.46 per share, to close at $8.84 the same day.

6.      Finally, during the Relevant Period, the Director Defendants (defined herein) negligently issued a materially false and misleading proxy statement urging stockholders to reelect the Director Defendants under false pretenses.

7.      As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Zynerba has sustained damages as described below.

---

[1] Treatment emergent adverse events are undesirable events not present prior to medical treatment, or an already present event that worsens either in intensity or frequency following the treatment.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

9.      Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Zynerba is incorporated in this District.  In addition, the defendants have conducted business in this District, and the defendants' actions have had an effect in this District.

## PARTIES

13.     Plaintiff is a current stockholder of Zynerba common stock.  Plaintiff has continuously held Zynerba common stock at least since December 23, 2016.

14.     Zynerba is a Delaware corporation with its principal executive offices at 80 W. Lancaster Avenue, Suite 300, Devon, PA 19333.  Zynerba's Common stock shares trade on the Nasdaq Global Select market ("NasdaqGS") under the ticker symbol "ZYNE."

15.     Defendant Armando Anido ("Anido") has served as Chairman of the Board and Chief Executive Officer since October 2014.  Defendant Anido is named as a defendant in the Securities Class Action.  According to the Company's filings with the SEC, defendant Anido received $2,001,096 in compensation in 2018.

16.     Defendant James E. Fickenscher ("Fickenscher") has served as the Company's Chief Financial Officer since September 2016.  Defendant Fickenscher is named as a defendant in the Securities Class Action.  According to the Company's filings with the SEC, defendant Fickenscher received $1,106,085 in compensation in 2018.

17.     Defendant John P. Butler ("Butler") has served as a director of the Company since April 2018.  According to the Company's filings with the SEC, defendant Butler received $380,680 in compensation in 2018.

18.     Defendant Warren D. Cooper ("Cooper") has served as a director of the Company since August 2015.  During the Relevant Period, defendant Cooper served as a member of the Company's Audit Committee.  According to the Company's filings with the SEC, defendant Cooper received $179,481 in compensation in 2018.

19.     Defendant William J. Federici ("Federici") has served as a director of the Company since August 2015.  During the Relevant Period, defendant Federici served as Chairman of the Company's Audit Committee.  According to the Company's filings with the SEC, defendant Federici received $166,858 in compensation in 2018.

20.     Defendant Thomas L. Harrison ("Harrison") served as a director of the Company between August 2015 and April 2019.  According to the Company's filings with the SEC, defendant Harrison received $160,356 in compensation in 2018.

21.     Defendant Daniel K. Kisner ("Kisner") has served as a director of the Company since August 2015.  According to the Company's filings with the SEC, defendant Kisner received $158,106 in compensation in 2018.

22.     Defendant Kenneth I. Moch ("Moch") has served as a director of the Company since August 2015.  During the Relevant Period, defendant Moch served as a member of the

Company's Audit Committee.  According to the Company's filings with the SEC, defendant Moch received $160,607 in compensation in 2018.

23.     Defendant Pamela Stephenson ("Stephenson") has served as a director of the Company since February 2019.

24.     Defendants Anido, Butler, Cooper, Federici, Harrison, Kisner, Moch, and Stephenson are sometimes referred to herein as the "Director Defendants."

25.     Defendants Cooper, Federici, and Moch are sometimes referred to herein as the "Audit Committee Defendants."

26.     Defendants Anido, Fickenscher, Butler, Cooper, Federici, Harrison, Kisner, Moch, and Stephenson are sometimes referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

30.     To discharge their duties, the officers and directors of Zynerba were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Zynerba were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such

conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

31.     Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

32.     According to the Company's Corporate Governance Guidelines, the Board members, and therefore the Director Defendants, are required to "to perform his or her duties in good faith, in a manner he or she reasonably believes to be in the best interests of the Company and its stockholders, and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances."

33.     The Company also maintains a Code of Business Conduct and Ethics (the "Code"). The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Zynerba and its subsidiaries.

34.     According to the Code, the employees and directors of Zynerba are responsible for helping Zynerba maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom Zynerba does business.

35.     Pursuant to the Code:

## I. Compliance with Laws, Rules, and Regulations

A variety of laws apply to the Company and its operations.  The Company requires that all employees comply with all laws, rules and regulations applicable to the Company, both in letter and in spirit.   These include, without limitation, laws covering bribery and kickbacks; the development, testing, approval, manufacture, marketing and sale of Company products and product candidates; copyrights, trademarks and trade secrets; information privacy; insider trading; antitrust prohibitions; employment discrimination or harassment; and the submission of false or misleading financial information.  Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors or other appropriate personnel.  Employees are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to seek advice when there is any uncertainty.  Any violations of laws, rules and regulations can result in civil and criminal penalties as well as disciplinary action from the Company.  Accordingly, any suspected noncompliance with applicable laws and/or related Company policies should be reported to the Compliance Officer.

*       *       *

## VII. Honest and Ethical Conduct and Fair Dealing

The Company is committed to achieving the highest standards of professionalism and ethical conduct in its operations and activities and expects its employees to conduct business according to the highest ethical standards of conduct, in addition to complying with all applicable laws, rules and regulations, including antitrust and competition laws.

*       *       *

## XVIII. Report with Integrity

The Company has an obligation to make and keep books, records and accounts that, in reasonable detail, accurately and fairly reflect the Company's transactions and to maintain tax records and prepare tax returns that comply with applicable laws, rules and regulations.  The Company must also maintain a system of internal accounting controls that meet applicable laws, rules and regulations, and prepare financial statements in accordance with generally accepted accounting principles and applicable laws, rules and regulations.  All employees who are responsible for any aspect of the Company's internal accounting controls and financial and tax reporting systems (including, but not limited to, the Chief Executive Officer, the Chief Financial Officer, the principal accounting officers and persons performing similar functions) must conduct themselves using high ethical standards of integrity and honesty, in a manner that allows the Company to meet accounting and legal

requirements and to prepare financial reports and financial statements that are not false or misleading, and that present full, fair, accurate, timely and understandable disclosure in the Company's periodic reports and other public communications.

36.      In addition, the Company's Audit Committee is specifically tasked with the Board's

oversight responsibilities.   The conduct of the Audit Committee is governed by the Audit

Committee Charter (the "Charter").

37.      Pursuant to the Charter:

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Zynerba Pharmaceuticals, Inc. (the "Company") is to assist the Board with oversight of the Company's accounting and financial reporting processes, the audit and integrity of the Company's financial statements and the qualifications and independence of the Company's independent auditor and to prepare any reports required of the Committee under the rules of the Securities and Exchange Commission (the "SEC").

*      *      *

## IV. RESPONSIBILITIES AND DUTIES

The Company's management is responsible for preparing the Company's financial statements and the independent auditor is responsible for auditing these financial statements.  The Committee is responsible for overseeing the conduct of these activities by the Company's management and the independent auditor, and the integrity of the Company's financial statements.  The financial management and the independent auditor of the Company have more time, knowledge and more detailed information on the Company than do Committee members.  Consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent auditor's work.  The Committee is also responsible for preparing the Report of the Audit Committee that SEC rules require be included in the Company's annual proxy statement.

In carrying out its oversight responsibilities, the Committee shall perform the following functions:

### Oversight of the Company's Independent Auditor

1. Be directly and solely responsible for the appointment, compensation, retention, termination and oversight of any independent auditor engaged by the Company for the purpose of preparing or issuing an audit report or performing other audit, review or attest services, with each such auditor reporting directly to the Committee.

2. Obtain and review annually a report from the independent auditor describing (i) the independent auditor's internal quality-control procedures, (ii) any material issues raised by the most recent internal quality-control review, peer reviews or Public Company Accounting Oversight Board ("PCAOB") review or by any inquiry or investigation by governmental or professional authorities within the preceding five (5) years respecting one or more independent audits carried out by the firm, and any steps taken to deal with such issues, and (iii) all relationships between the independent auditor and the Company or any of its subsidiaries; and to actively discuss with the independent auditor this report and any disclosed relationships or services that may impact the objectivity and independence of the auditor and to take, or recommend that the Board take, appropriate action to oversee the independence of the independent auditor.

3. Evaluate annually the qualifications, performance and independence of the independent auditor, including (i) an evaluation of the lead audit partner, (ii) confirmation of the regular rotation of the lead audit partner responsible for reviewing the audit within the applicable time periods provided by law, (iii) a review of whether the independent auditor's quality-control procedures are adequate and (iv) a review and evaluation of the lead partner of the independent auditor, taking into account the opinions of management, and report to the Board on its conclusions, together with any recommendations for additional action.

4. Pre-approve all audited and permitted non-audit and tax services that may be provided by the Company's independent auditor or other registered public accounting firm pursuant to the Company's pre-approval policies. The Committee may delegate this pre-approval authority to any one or more independent members pursuant to the Company's pre-approval policies.

5. Meet with the independent auditor prior to the audit to discuss the planning and staffing of the audit. Discuss with the independent auditor the responsibilities, budget and staffing of the audit functions.

6. Establish policies for the hiring of employees or former employees of the independent auditor who participated in any capacity in the audit of the Company, taking into account the impact of such policies on auditor independence.

7. Regularly review with the independent auditor any significant difficulties encountered during the course of the audit, any restrictions on the scope of work or access to required information and any significant disagreement among management and the independent auditor in connection with the preparation of the financial statements. Review with the independent auditor (i) any accounting adjustments that were noted or proposed by the independent auditor but that were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the independent auditor's national office respecting auditing or accounting issues presented by the engagement, (iii) any "management" or "internal control" letter or schedule of unadjusted differences issued, or proposed to be issued, by the independent auditor to the Company, and (iv) any other material

written communication provided by the independent auditor to the Company's management.

8. Review with the independent auditor the critical accounting policies and practices used by the Company, alternative treatments of financial information within generally accepted accounting principles ("GAAP") that the independent auditor has discussed with management, the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditor.

**Review of Financial Reporting, Policies and Processes**

1. Review and discuss with management and the independent auditor the Company's annual audited financial statements, interim financial statements and any certification, report, opinion or review rendered by the independent auditor; recommend to the Board whether the annual audited financial statements and related notes should be included in the Company's annual report on Form 10-K; and prepare the Committee's report required by the rules of the SEC to be included in the Company's annual proxy statement.

2. Review and discuss with management and the independent auditor the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing in the Company's periodic reports, and consider with the independent auditor the matters required to be discussed by the applicable Auditing Standards issued by the Public Company Accounting Oversight Board.

3. Review and discuss with management and the independent auditor the Company's earnings press releases as well as any financial information and earnings guidance provided to analysts and ratings agencies, in each case, including the type of information to be included and its presentation and the use of any pro forma or adjusted non-GAAP information.

4. Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

5. Review quarterly with management its assessment of the effectiveness and adequacy of the Company's internal control structure and procedures for financial reporting ("Internal Controls") and any special steps taken in light of a deficiency, review annually with the independent auditor the attestation to and report on the assessment made by management, if any, and consider whether any changes to the Internal Controls are appropriate.

6. Review with management its evaluation of the Company's disclosure controls, and consider whether any changes are appropriate.

7. Review with management and the independent auditor the effect of regulatory and accounting initiatives on the financial statements, as well as any off-balance sheet structures.  Review any major issues regarding accounting principles and financial statement presentations, including any significant changes in selection of an application of accounting principles.  Consider and approve, if appropriate, changes to the Company's auditing and accounting principles and practices as suggested by the independent auditor or management.

*     *     *

**Risk Management, Legal Compliance and Ethics**

1. Review with the principal executive officer, principal financial officer and principal accounting officer of the Company any report on significant deficiencies in the design or operation of the Internal Controls that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to or by the auditor, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.

2. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

3. Consider and present to the Board for adoption a Code of Business Conduct and Ethics for all employees and directors, which meets the requirements of Item 406 of the SEC's Regulation S-K (or any successor disclosure item), and provide for prompt disclosure to the public of any change in, or waiver of, such Code of Business Conduct and Ethics.  Review such Code of Business Conduct and Ethics periodically and recommend such changes to such Code of Business Conduct and Ethics as the Committee shall deem appropriate, and adopt procedures for monitoring and enforcing compliance and investigating non-compliance with such Code of Business Conduct and Ethics.

4. Discuss guidelines and policies to govern the process by which risk assessment and management is undertaken and handled. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

5. Periodically review the Company's policies and procedures with respect to data privacy and security and other cybersecurity measures employed by the Company in the conduct of its business.

6. Review with the Company's counsel and report to the Board on litigation, material government investigations and compliance with applicable legal requirements and the Company's Code of Business Conduct and Ethics.

38.     In violation of the Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements, resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting. The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

39.     Each of the Individual Defendants further owed to Zynerba and its stockholders the duty of loyalty, which requires that each favor Zynerba's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain a personal advantage.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

40.     Zynerba is a small pharmaceutical company[2] developing and clinically testing its product, Zygel. The Company has referred to Zygel as "its lead asset." Importantly, the Company has no other drugs under development.

41.     Zygel is a transdermal CBD gel intended to treat rare and near-rare neuropsychiatric disorders, including DEE in patients aged three to seventeen years. According to the Company, DEE is a heterogeneous group of epilepsy syndromes, often progressive, that involve significant

_____

[2] As of December 31, 2018, Zynerba only had twenty-five employees.

developmental impairment or regression of developmental progress and are highly resistant to treatment, such as Dravet or Lennox-Gastaut syndrome.

42.     The Individual Defendants touted Zygel as the "first and only patent-protected permeation-enhanced pharmaceutically-produced cannabidiol (CBD) gel formulated for transdermal delivery."

43.     Since its inception, Zynerba has never been profitable because the Company has no FDA-approved drugs.  The Company was able to operate with continual net losses through the issuance of equity securities.  Indeed, the Individual Defendants and the Company have conceded that Zynerba expects to incur losses for the foreseeable future and expects its losses to increase as it continues developing and seeking regulatory approvals for Zygel.

44.     Other than Zygel, Zynerba has not succeeded in developing a profitable product. For example, Zynerba's past developmental drug coded ZYN001 failed its clinical trials, and the Company decided to discontinue development of ZYN001 following receipt of top line results for its Phase 1 study in 2018.

45.     As with any newly developed drug, to obtain approval to market and sell Zygel in the United States, Zynerba must follow FDA rules and regulations regarding clinical testing to prove the drug's safety and efficacy.  This includes human clinical trials that proceed in three phases referred to as Phase 1 clinical trials, Phase 2 clinical trials, and Phase 3 clinical trials.

46.     Phase 1 clinical trials are conducted in a small number of volunteers or patients to assess the early tolerability and safety profile, and the pattern of drug absorption, distribution, and metabolism.

47.     Phase 2 clinical trials are conducted in a limited patient population afflicted with a specific disease to assess appropriate dosages and dose regimens, expand evidence of the safety profile, and evaluate preliminary efficacy.

48.     Phase 3 clinical trials are larger scale, multicenter, well-controlled, and are conducted on patients with a specific disease to generate enough data to statistically evaluate the efficacy and safety of the product for approval, as required by the FDA, to establish the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug.

49.     FDA requires that developmental pharmaceutical companies like Zynerba notify the FDA within fifteen days after learning of a "serious adverse drug experience." Serious adverse drug experiences include any reactions that are fatal, life threatening, or require in-patient hospitalization or prolong hospitalization. If the series adverse drug experience entails an "unexpected reaction," the FDA requires the pharmaceutical company to notify it by telephone, facsimile transmission, or in writing, within seven calendar days of the receipt of that information. In addition, a complete written report must follow within eight calendar days. The FDA considers all the clinical trials results and nonclinical studies in determining whether to approve a drug to be marketed and sold. *See* 21 C.F.R. §§ 314.125(b), 314.126(a).

50.     Before the Relevant Period, the Individual Defendants represented that Zygel had been demonstrated to be safe and well tolerated in Phase 1 clinical testing.

51.     For example, on April 10, 2018, the Individual Defendants caused the Company to issue a press release that announced that the Company had initiated the Phase 2 BELIEVE 1 trial. The Phase 2 BELIEVE 1 trial entailed a six-month open label multi-dose clinical trial designed to evaluate the efficacy and safety of Zygel in patients aged three through seventeen with DEE.

52.     An open-label trial, or open trial, is a type of clinical trial in which information is not withheld from trial participants.  In particular, both the researchers and participants know which treatment is being administered.  This contrasts with a blinded experiment, where information is withheld to reduce bias.

53.     As was required by FDA regulations, Zynerba maintained a safety database for Zygel, tracking safety events during the clinical testing.

54.     Zynerba enrolled less than fifty patients in the trial with a primary efficacy endpoint of changing seizure frequency and an additional endpoint of safety measured by adverse events. The Company conducted the BELIEVE 1 trial study in Australia and New Zealand.

55.     On December 17, 2018, the Company announced that it had completed enrollment in the BELIEVE 1 study and that it would report top line results in the third quarter of 2019.

56.     The Individual Defendants represented that patients enrolled in the trial would complete a four week baseline period to determine seizure frequency, receive a daily 250 mg to 500 mg daily weight based dose of Zygel for a two week period, and then receive 250 mg to 1,000 mg daily maintenance doses for the following twenty-four weeks.

## THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS

57.     During the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that almost all patients enrolled in the BELIEVE I Trial suffered treatment emergent adverse events, a majority also suffered treatment related adverse events, and more than one fifth suffered serious adverse events, thus triggering a heightened risk to continued development of Zygel and the Company's prospects for obtaining regulatory approval to market Zygel for the

treatment of DEE patients between ages three to seventeen.   The Individual Defendants intentionally obscured and omitted this information from investors.

58.     On March 11, 2019, the Individual Defendants caused the Company to file a Form 10-K (the "2018 10-K") disclosing the Company's financial operational results for the fourth quarter of 2018 and 2018 annually.   The 2018 10-K was signed by defendants Anido and Fickenscher.   As to the BELIEVE 1 trial, the 2018 10-K stated:

> In April 2018, we initiated the Phase 2 BELIEVE 1 (Open Label Study to Assess the Safety and Efficacy of Zygel Administered as a Transdermal Gel to Children and Adolescents with Developmental and Epileptic Encephalopathy) clinical trial, a six-month open label multi-dose clinical trial designed to evaluate the efficacy and safety of Zygel in children and adolescents (three to 17 years) with DEE as classified by the International League Against Epilepsy (ILAE) (Scheffer et al. 2017).  Enrollment in this study was complete in December 2018 and 48 patients with confirmed DEE are being dosed in the clinical trial, 27% of whom have either Dravet or Lennox-Gastaut syndrome.  Enrolled patients will receive weight-based initial doses of 250 mg daily or 500 mg daily and during the maintenance phase patients may receive up to 1000 mg daily of Zygel. The primary endpoint is change in seizure frequency from baseline.  We expect to report top line results from the BELIEVE 1 trial in the third quarter of 2019.

59.     The 2018 10-K also touted the purported benefits of Zygel and CBD for patients suffering from DEE:

> We believe that Zygel may provide an effective treatment for epilepsy based on the anticonvulsant effects of CBD due to its ability to reduce neuronal hyperexcitability shown in multiple in vivo models of epilepsy and clinical trials conducted by third parties.  Epilepsy specialists and patient organizations have shown considerable interest in the potential therapeutic role of CBD in adults with epilepsy and especially, children with DEE.

60.     The 2018 10-K also included generic boilerplate risks disclosures regarding the potential poor clinical results, including (1) "***Because the results of preclinical studies and earlier clinical trials are not necessarily predictive of future results, Zygel may not have favorable results in our planned clinical trials***"; (2) "***Failures or delays in our clinical trials of Zygel could result in increased costs to us and could delay, prevent or limit our ability to generate revenue***

*and continue our business*"; and (3) "***The regulatory approval processes of the FDA, the EMA and other comparable foreign regulatory authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed***."  (Emphases original).

61.     The above statements in ¶¶ 58-60 were materially false and/or misleading because, with the two week dosing period for trial patients already complete and maintenance dosing well underway in the open label BELIEVE 1 trial, the Individual Defendants already knew but failed to disclose that almost all patients enrolled in the BELIEVE 1 trial suffered treatment emergent adverse events, a majority also suffered treatment related adverse events, and more than one fifth suffered serious adverse events, thus trigging a heightened risk to continued development of Zygel and the Company's prospects for obtaining regulatory approval to market Zygel for the treatment of DEE in patients aged between three and seventeen.

62.     In addition, the 2018 10-K included signed certifications by defendant Anido pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which stated:

1.     I have reviewed this Annual Report on Form 10-Q of Zynerba, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a15(f) and 15d-15(f)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

63.    Defendant Anido's representation that the Company has adequate internal control over financial reporting was materially false and misleading because the Individual Defendants failed to disclose the materially adverse information discussed in ¶ 61.

64.     On May 8, 2019, the Individual Defendants caused the Company to file a Form 10-Q (the "1Q2019 10-Q") disclosing the Company's financial and operational results for the first quarter of 2019.  The 1Q2019 10-Q was signed by defendants Anido and Fickenscher.  As to the BELIEVE 1 trial, the 1Q2019 10-Q stated:

> In April 2018, we initiated the Phase 2 BELIEVE 1 (Open Label Study to Assess the Safety and Efficacy of Zygel Administered as a Transdermal Gel to Children and Adolescents with Developmental and Epileptic Encephalopathy) clinical trial, a six-month open label multi-dose clinical trial designed to evaluate the efficacy and safety of Zygel in children and adolescents (three to 17 years) with DEE as classified by the International League Against Epilepsy (ILAE) (Scheffer et al. 2017).  Enrollment in this study was complete in December 2018 and 48 patients with confirmed DEE are being dosed in the clinical trial, 27% of whom have either Dravet or Lennox-Gastaut syndrome.  Patients received weight-based initial doses of 250 mg or 500 mg daily and during the maintenance phase patients receive up to 1000 mg daily of Zygel.  The primary endpoint is change in seizure frequency from baseline.  We expect to report top line results from the BELIEVE 1 trial in the third quarter of 2019.

65.     The 1Q2019 10-Q also touted the purported benefits of Zygel and CBD for patients suffering from DEE:

> We are currently evaluating ZygelTM, a patent-protected transdermal cannabidiol, or CBD, gel for the treatment of FXS, DEE and ASD.  Prior to February 2019, Zygel was referred to as ZYN002.  In 2017, we completed three Phase 2 clinical trials for Zygel and two of those studies have open-label extensions that are ongoing.  In April 2018, we initiated an open-label Phase 2 clinical trial evaluating Zygel in children and adolescent patients with DEE, and in July 2018, we initiated what we believe will be a pivotal clinical trial evaluating Zygel in children and adolescent patients with FXS. In March 2019, we initiated an open-label Phase 2 clinical trial evaluating Zygel in children and adolescent patients with ASD.  We intend to initiate a trial in 22q during the first half of 2019.

> Cannabinoids are a class of compounds derived from *Cannabis* plants.  The two primary cannabinoids contained in *Cannabis* are CBD and Tetrahydrocannabinol, or THC.  Clinical and preclinical data suggest that CBD has positive effects on treating behavioral symptoms of FXS, ASD, 22q and seizures in patients with epilepsy.

66.     The 1Q2019 10-Q also included generic boilerplate risks disclosures regarding the potential poor clinical results, including "the results, cost and timing of our preclinical studies and

clinical trials, including any delays to such clinical trials relating to enrollment or site initiation, as well as the number of required trials for regulatory approval and the criteria for success in such trials" and "legal and regulatory developments in the United States and foreign countries, including any actions or advice that may affect the design, initiation, timing, continuation, progress or outcome of clinical trials or result in the need for additional clinical trials."

67.     The above statements in ¶¶ 64-66 were materially false and/or misleading because, with the two week dosing period for trial patients already complete and maintenance dosing well underway in the open label BELIEVE 1 trial, the Individual Defendants already knew but failed to disclose that almost all patients enrolled in the BELIEVE 1 trial suffered treatment emergent adverse events, a majority also suffered treatment related adverse events, and more than one fifth suffered serious adverse events, thus trigging a heightened risk to continued development of Zygel and the Company's prospects for obtaining regulatory approval to market Zygel for the treatment of DEE in patients aged between three and seventeen.

68.     In addition, the 1Q2019 10-Q included signed certifications by defendant Anido pursuant to the SOX similar to the certifications included in the 2018 10-K.  Again, defendant Anido's representation that the Company had adequate internal control over financial reporting was materially false and misleading because the Individual Defendants failed to disclose the materially adverse information discussed in ¶ 67.

69.     On June 7, 2019, the Individual Defendants caused Zynerba to publish a slideshow presentation for investors discussing the multi-billion-dollar market opportunity for Zygel and the BELIEVE 1 Trial.  The material in the slideshow confirmed that "dosing continues" and cited a "[c]ompelling rationale for [the] utility of CBD in DEE" based on "[t]hird party clinical data

show[ing] [the] impact of CBD on seizures and behavioral issues in children[.]"  With respect to

the BELIEVE 1 trial, the slideshow included:





**Developing Zygel in DEE**

**Enrollment Complete in BELIEVE 1 Trial**

- Compelling rationale for utility of CBD in DEE
    - Third party clinical data show impact of CBD on seizures and behavioral issues in children
- Patient enrollment in BELIEVE 1 Phase 2 study complete
    - Six month multi-dose study in DEE patients (3 through 17 years)
    - Being conducted in Australia and New Zealand
    - Inclusion criteria require ≥5 generalized motor seizures during baseline
    - ~27% have Dravet or LGS
    - Primary efficacy assessment: change in seizure frequency
- Top line results expected in 3Q2019

19

70.    The above statements in ¶ 69 were materially false and/or misleading because, with

the two week dosing period for trial patients already complete and maintenance dosing well

underway in the open label BELIEVE 1 trial, the Individual Defendants already knew but failed

to disclose that almost all patients enrolled in the BELIEVE 1 trial suffered treatment emergent

adverse events, a majority also suffered treatment related adverse events, and more than one fifth

suffered serious adverse events, thus trigging a heightened risk to continued development of Zygel

and the Company's prospects for obtaining regulatory approval to market Zygel for the treatment

of DEE in patients aged between three and seventeen.

71.     On August 6, 2019, the Individual Defendants caused the Company to file a Form 10-Q (the "2Q2019 10-Q") reporting the Company's financial and operational results for the second quarter of 2019. The 2Q2019 10-Q was signed by defendants Anido and Fickenscher.  As to the BELIEVE 1 trial, the 2Q2019 10-Q stated:

> In April 2018, we initiated the Phase 2 BELIEVE 1 (Open Label Study to Assess the Safety and Efficacy of Zygel Administered as a Transdermal Gel to Children and Adolescents with Developmental and Epileptic Encephalopathy) clinical trial, a six-month open label multi-dose clinical trial designed to evaluate the efficacy and safety of Zygel in children and adolescents (three to 17 years) with DEE as classified by the International League Against Epilepsy (ILAE) (Scheffer et al. 2017).  Enrollment in this study was complete in December 2018 and 48 patients with confirmed DEE are being dosed in the clinical trial, 27% of whom have either Dravet or Lennox-Gastaut syndromes.  Patients received weight-based initial doses of 250 mg or 500 mg daily and during the maintenance phase patients receive up to 1000 mg daily of Zygel.  The primary endpoint is change in seizure frequency from baseline.  We expect to report top line results from the BELIEVE 1 trial in September of 2019.

72.     The 1Q2019 10-Q also touted the purported benefits of Zygel and CBD for patients suffering from DEE:

> We are currently evaluating ZygelTM, a patent-protected transdermal cannabidiol, or CBD, gel for the treatment of FXS, DEE, ASD and 22q.  In 2017, we completed three Phase 2 clinical trials for Zygel and two of those studies have open-label extensions that are ongoing.  In April 2018, we initiated an open-label Phase 2 clinical trial evaluating Zygel in children and adolescent patients with DEE, and in July 2018, we initiated what we believe will be a pivotal clinical trial evaluating Zygel in children and adolescent patients with FXS.  In March 2019, we initiated an open-label Phase 2 clinical trial evaluating Zygel in children and adolescent patients with ASD and in May 2019, we initiated an open-label Phase 2 clinical trial evaluating Zygel in children and adolescent patients with 22q.

> Cannabinoids are a class of compounds derived from *Cannabis* plants. The two primary cannabinoids contained in *Cannabis* are CBD and Tetrahydrocannabinol, or THC. Clinical and preclinical data suggest that CBD has positive effects on treating behavioral symptoms of FXS, ASD, 22q and seizures in patients with epilepsy.

73.     The 2Q2019 10-Q also included generic boilerplate risks disclosures regarding the potential poor clinical results, including "the results, cost and timing of our preclinical studies and

clinical trials, including any delays to such clinical trials relating to enrollment or site initiation, as well as the number of required trials for regulatory approval and the criteria for success in such trials" and "legal and regulatory developments in the United States and foreign countries, including any actions or advice that may affect the design, initiation, timing, continuation, progress or outcome of clinical trials or result in the need for additional clinical trials."

74.     The above statements in ¶¶ 71-73 were materially false and/or misleading because, with the two week dosing period for trial patients already complete and maintenance dosing well underway in the open label BELIEVE 1 trial, the Individual Defendants already knew but failed to disclose that almost all patients enrolled in the BELIEVE 1 trial suffered treatment emergent adverse events, a majority also suffered treatment related adverse events, and more than one fifth suffered serious adverse events, thus trigging a heightened risk to continued development of Zygel and the Company's prospects for obtaining regulatory approval to market Zygel for the treatment of DEE in patients aged between three and seventeen.

75.     The Individual Defendants also revealed in the 2Q19 10-Q that in the second quarter of 2019, Zynerba had sold and issued 2,082,031 shares of common stock under an Open Market Sales Agreement with Jefferies LLC in the open market at a weighted average selling price of $13.50 per share, resulting in gross proceeds of $28.1 million.  Net proceeds received after deducting commissions and offering expenses were $27 million.  Had the market known about the avalanche of adverse effects suffered during the BELIEVE I trial for Zynerba's only product in development, it might not have been able to achieve $27 million in net proceeds which, with no product revenue, it desperately needed to continue funding its research and development activities.

76.     In addition, the 2Q2019 10-Q included signed certifications by defendant Anido pursuant to the SOX similar to the certifications included in the 2018 10-K.  Nevertheless,

defendant Anido's representation that the Company had adequate internal control over financial reporting was materially false and misleading because the Individual Defendants failed to disclose the materially adverse information discussed in ¶ 74.

77.     The same day, the Individual Defendants caused the Company to file a corporate overview presentation for investors, attached to a Form 8-K, discussing the BELIEVE 1 Trial which reiterated the statements made in the June 7, 2019 presentation.  Further, on August 12, 2019, the Individual Defendants caused the Company to issue an investor presentation reiterating statements made in the June 7, 2019 presentation.  These presentations were materially false and misleading for the reasons stated in ¶ 70.

78.     On August 30, 2019, the Individual Defendants announced that Zynerba entered into a Controlled Equity Offering Sales Agreement with Cantor Fitzgerald & Co., Canaccord Genuity LLC, H.C. Wainwright & Co., LLC, and Ladenburg Thalmann & Co. Inc., as sales agents, pursuant to which the Company may issue and sell shares of its common stock, par value $0.001 per share, in an aggregate offering price of up to $75 million.  Therein the Company repeated its statements regarding the Phase 2 BELIEVE I Trial set forth in 2018 10-K, 1Q2019 10-Q, and 2Q2019 10-Q, which mislead investors for the reasons stated in ¶ 70.

**THE TRUTH IS REVEALED**

79.     On September 18, 2019, during pre-market hours, Zynerba issued a press release announcing results from the BELIEVE 1 trial.  Therein, Zynerba revealed that, among patients enrolled in the BELIEVE 1 Trial and treated with Zygel, the rate of treatment emergent adverse events was 96% and the rate of treatment related adverse events was 60%.  The Company further reported that ten out of forty-six trial patients reported serious adverse events.  Eight patients discontinued the study altogether.

80.     On this news, Zynerba's stock price fell $2.46 per share, or 21.77%, to close at $8.84 per share on September 18, 2019.

**THE DIRECTOR DEFENDANTS ISSUED A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT DURING THE RELEVANT PERIOD.**

81.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Director Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period.   The Director Defendants drafted, approved, reviewed, and/or signed a Form DEF14A before it was filed with the SEC and disseminated to Zynerba's stockholders on April 25, 2019 (the "2019 Proxy").   The Director Defendants negligently issued materially misleading statements in the 2019 Proxy.   These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.   Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

82.     The 2019 Proxy sought stockholder votes to, among others, elect Director Defendants for a three-year term.

83.     In support of the Director Defendants' bid to reelect themselves, the Director Defendants highlighted their supposed oversight of the Company.   In particular, the 2019 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Zynerba faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.   The 2019 Proxy stated:

**Role of Board in Risk Oversight Process**

One of the key functions of our Board is informed oversight of our risk management process.   Our Board does not have a standing risk management committee, but

27

rather administers this oversight function directly through the Board as a whole, as well as through various standing committees of our Board that address risks inherent in their respective areas of oversight. Our Audit Committee oversees management of enterprise risks and financial risks, cybersecurity and data protection risks, as well as potential conflicts of interests. Our Compensation Committee is responsible for overseeing management of risks relating to our executive compensation plans and arrangements, and the incentives created by the compensation awards it administers. Our Nominating and Corporate Governance Committee is responsible for overseeing management of risks associated with the independence of our Board. Pursuant to our Board's instruction, our management regularly reports on applicable risks to the relevant committee or the Board, as appropriate, with additional review or reporting on risks conducted as needed or as requested by our Board and its committees.

\*       \*       \*

## REPORT OF THE AUDIT COMMITTEE

The following is the report of our Audit Committee with respect to our audited financial statements included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on or about March 11, 2019 (the *"Annual Report")*. The information contained in this report shall not be deemed to be "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, except to the extent that the Company specifically incorporates it by reference in such filing.

Our Audit Committee oversees our financial reporting process on behalf of our Board. Management has the responsibility for the financial statements and the reporting process, including internal control systems. Our independent registered public accounting firm, KPMG LLP, is responsible for expressing an opinion as to the conformity of our audited financial statements with accounting principles generally accepted in the United States of America.

### Review and Discussions with Management and Independent Accountants

The Audit Committee reviewed and discussed the audited financial statements with management of the Company. The Audit Committee also met with KPMG LLP to review the financial statements included in the Annual Report. The Audit Committee discussed with a representative of KPMG LLP the matters required to be discussed by Public Company Accounting Oversight Board ("*PCAOB*") Auditing Standard No. 1301, as amended, "Communication with Audit Committees." In addition, the Audit Committee met with KPMG LLP, with and without management present, to discuss the overall scope of KPMG LLP's audit, the results of its examinations and the overall quality of the Company's financial reporting. The Audit Committee received the written disclosures and the letter from KPMG LLP required by Rule 3526 of the PCAOB, *Communication with Audit*

*Committee Concerning Independence,* and has discussed with KPMG LLP its independence, and satisfied itself as to the independence of KPMG LLP.

Based on the above review, discussions, and representations received, the Audit Committee recommended to the Board of Directors that the audited financial statements for the fiscal year ended December 31, 2018 be included in the Company's Annual Report and filed with the SEC.

84.     The 2019 Proxy, thus, assured stockholders that both the Individual Defendants and the Board members were involved with Zynerba's business strategy, actively monitored the Company's risks and exposures, followed good corporate governance practices, and acted in an ethical and legal manner.  In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose to investors that almost all patients enrolled in the BELIEVE I Trial suffered treatment emergent adverse events, a majority also suffered treatment related adverse events, and more than one fifth suffered serious adverse events, thus triggering a heightened risk to continued development of Zygel and the Company's prospects for obtaining regulatory approval to market Zygel for the treatment of DEE in children and adolescents.

85.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect the Director Defendants.

## DAMAGES TO THE COMPANY

86.     As a result of the Individual Defendants' wrongful conduct, Zynerba disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Zynerba's credibility. Zynerba has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

87.     Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

88.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Zynerba's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

89.     Moreover, these actions have irreparably damaged Zynerba's corporate image and goodwill.  For at least the foreseeable future, Zynerba will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Zynerba's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90.     Plaintiff incorporates the allegations herein by reference.

91.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

92.     Plaintiff is a stockholder of Zynerba, was a stockholder of Zynerba at the time of the wrongdoing alleged herein, and has been a stockholder of Zynerba continuously since that time.

93.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

94.     At the time of the filing of this complaint, the Zynerba Board consists of the following seven individuals: defendants Anido, Cooper, Butler, Federici, Kisner, Moch, and Stephenson.

95.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Zynerba Board to institute this action against the Individual Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the current members of the Board because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

96.     The Individual Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

97.     Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or recklessly allowed, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial

likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Zynerba to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Individual Defendants.

98.     Further, defendant Anido is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.  Additionally, defendant Anido is not independent because his principal source of income comes from his employment with Zynerba. In 2018 alone, defendant Anido received $2,001,096 from the Company in compensation, which amount is material to him.

**DEMAND IS EXCUSED AS TO THE AUDIT COMMITTEE DEFENDANTS BECAUSE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

99.     As members of the Audit Committee during the Relevant Period, the Audit Committee Defendants participated in and knowingly approved the filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to oversee and monitor (a) the integrity of the Company's financial statements, and (b) the Company's compliance with legal and regulatory requirements.  Instead, the Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls, and compliance with legal and regulatory requirements, as required by the Charter.  For this reason, demand is futile as to the Audit Committee Defendants.

## COUNT I
### VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT
### (Against the Director Defendants)

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

102.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2019 Proxy.  In the 2019 Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

103.    The 2019 Proxy, however, misrepresented and failed to disclose, among others, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Individual Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Zynerba misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants to the Board.

104.    Plaintiff, on behalf of Zynerba, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2019 Proxy in connection with the improper reelection of the Director Defendants to the Board.

## COUNT II
### BREACH OF FIDUCIARY DUTY
**(Against the Individual Defendants)**

105.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

106.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zynerba's business and affairs.

107.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

108.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.   The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zynerba.

109.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

110.    In addition, the Individual Defendants further breached their fiduciary duties owed to Zynerba by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and failed to disclose to investors that almost all patients enrolled in the BELIEVE I Trial suffered treatment emergent adverse events, a majority also suffered treatment related adverse events, and more than one fifth suffered serious adverse events, thus triggering a heightened risk to continued development of Zygel and the Company's prospects for obtaining regulatory approval to market Zygel for the treatment of DEE in children and adolescents.

111.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

112.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

113.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

114.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

115.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zynerba has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

116.    Plaintiff on behalf of Zynerba has no adequate remedy at law.

## COUNT III
### WASTE OF CORPORATE ASSETS
### (Against Individual Defendants)

117.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

118.   As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, Zynerba is subject to the Securities Class Action.  The Individual Defendants have caused Zynerba to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

119.   As a result of this waste of corporate assets, the Company has been damaged and the Individual Defendants are each liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of Zynerba and that Plaintiff is a proper and adequate representative of the Company;

B.   Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.   Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: April 24, 2020

**DELEEUW LAW LLC**

*/s/ P. Bradford deLeeuw*
P. Bradford deLeeuw (#3569)
1301 Walnut Green Road
Wilmington, DE 19807
(302) 274-2180
*Attorney for Plaintiff*

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
Garam Choe
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 355-4648